## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JERE EATON, | ) | 3:21-CV-324 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STEVEN ESTABROOK and CITY OF | ) | |
| STAMFORD, | ) | January 26, 2023 |
| *Defendants*. | ) | |

## RULING AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Sarala V. Nagala, United States District Judge.

Plaintiff Jere Eaton brought this civil rights action against the City of Stamford (the "City") and Steven Estabrook, a police officer employed by the City (together with the City, "Defendants"), alleging that Estabrook shoved her to the ground when responding to another officer's call for assistance during a protest. Defendants have moved for summary judgment, contending that Estabrook did not violate federal or state law and that, even if he did, he is protected by qualified immunity under federal law and governmental immunity under Connecticut state law. For the reasons that follow, the Court finds that there are genuine disputes of fact material to the question of whether Estabrook used excessive force when shoving Plaintiff to the ground. The Court also concludes, however, that federal qualified immunity shields Estabrook from liability, and that Connecticut state law immunities shield both Defendants from liability. Thus, the Court GRANTS Defendants' motion for summary judgment.

## I.      FACTUAL BACKGROUND

The record contains the following facts, which are undisputed except when noted. On August 8, 2020, there was a protest in Stamford, Connecticut, called "Justice for Steven Barrier," after an individual who died after being taken into police custody in Stamford in October of 2019.

Pl.'s Local Rule ("L. R.") 56(a)2 Statement ("St."), ECF No. 25-5, ¶ 2; Compl., ECF No. 1, ¶ 9; Ans., ECF No. 9, ¶ 9.  Captain Diedrich Hohn, employed by the City's police department for twenty-six years, was responsible for "monitoring" the protest and overseeing police units under his command during it.  Pl.'s L. R. 56(a)2 St. ¶¶ 1–2, 4.  Hohn met with the leaders of the protest before it began and understood that the protest would end at the police headquarters.  *Id.* ¶ 6. Plaintiff, who is a community leader in Stamford, represents that she had discussions with Hohn about how she would be "assisting law enforcement with the handling of the protesters," while participating in the protest.  Pl.'s St. of Suppl. Facts, ECF No. 25-5 at 12–13, ¶¶ 1–2.  Estabrook, a patrol officer employed by the City's police department for five years, was assigned to cover the protest.  Pl.'s L. R. 56(a)2 St. ¶ 3.

Throughout the protest, the protesters directed much of their ire at the police officers, yelled insults at them, taunted them, and pushed them.  *Id.* ¶ 7.  Plaintiff herself observed that the protesters employed "horrible" language at "a very loud decibel."  *Id.* ¶ 18.  Although police officers stopped vehicular traffic to allow the protesters to walk on the street, several protesters "were observed knocking on car windows and placing flyers on the windshields of the cars."  *Id.* ¶ 9.  At one point, while the protest passed a restaurant, protesters entered the outside dining area and began "harassing" customers.  *Id.* ¶ 10.  Estabrook observed some of this conduct throughout the day.  *See id.* ¶ 40.

When the protest reached the police headquarters, which Hohn understood to be the predesignated endpoint, approximately fifty protesters decided to continue the protest by walking the wrong way down the one-way street past the police station—blocking vehicular traffic on the street in the process.  *Id.* ¶ 14.  Plaintiff was among this group of protesters.  *Id.* ¶ 17.

At this point, the protest became "loud" and "chaotic." *Id.* ¶ 31.  The police officers asked the protesters to move the protest onto the sidewalk to allow vehicular traffic to pass, but the protesters refused.  *Id.* ¶ 20.  Defendants represent that the protesters became "uncontrollable and aggressive" and began to outnumber the police officers at the scene.  Defs.' L. R. 56(a)1 St., ECF No. 21-1, ¶¶ 25–27.  Although Plaintiff disputes that characterization of the facts, Pl.'s L. R. 56(a)2 St. ¶¶ 25–27, video footage from the body cameras of several police officers present at the scene demonstrates that the tension between the police officers and the protesters was unmistakably growing.  Plaintiff does not dispute that she heard the officers repeatedly telling protesters to "get back" and that they would be arrested if they did not get back on the sidewalk.  *Id.* ¶¶ 30, 32. Plaintiff asserts that *she* did not back up or move to the sidewalk, however, because she was tasked with assisting law enforcement officers with handling the protestors.  *Id.* ¶ 33; Pl.'s St. of Suppl. Facts ¶ 2.  The video footage from the body camera of a police officer at the scene supports Plaintiff's statement of the facts on this point: she can be seen standing between the agitated protesters and the police officers, stretching one hand toward each group and attempting to appease both.  Nevertheless, the protesters did not disperse or move onto the sidewalk as directed by the police officers.  *See* Pl.'s L. R. 56(a)2 St. ¶¶ 19, 32.

Then, Hohn and another police officer at the scene, Lieutenant Nolo, called a Code 30, the most urgent of three possible police codes.  *Id.* ¶¶ 28, 36.  A Code One requires a routine response; a Code Two requires an urgent response; and a Code Three requires an emergency response.[1]  *Id.* ¶ 34.  A Code Three is "rarely called and is a very serious call."  *Id.* ¶ 35.  Hohn called a Code 30 "because he was concerned about officer safety."  *Id.*

---

[1] Defendants provide no explanation for the distinction between a "Code Three" and a "Code 30."  For the purposes of the present motion, the Court will assume they refer to the same emergency response call.

At the time Hohn and Nolo called the Code 30, Estabrook was blocking vehicular traffic at an intersection down the street from the protest. *Id.* ¶ 38. Upon hearing the Code 30, Estabrook understood that he had to act "immediately" to get to the calling officer and help him. *Id.* ¶¶ 41–42. He represents that, upon exiting his patrol vehicle, he saw "a large group of people yelling and screaming," and they "appeared to be surrounding" Hohn and the other police officers. Defs.' L. R. 56(a)1 St. ¶ 44. He ran toward the group of protesters and "pressed" through the crowd, but his path to Hohn was blocked by two men, one of whom was six feet, four inches tall. *Id.* ¶¶ 46–47. Estabrook attests that he did not see Plaintiff at this point. *Id.* ¶ 51. He contends that he "pushed" the two men to gain access to Hohn and that, when those two men fell, he saw Plaintiff fall as well because she had been standing behind one of the men. *Id.* ¶¶ 47–49. Thus, Estabrook contends that he "may have collided" with Plaintiff as a result of him pushing the two men out of his path, but he did not see Plaintiff prior to that collision. *Id.* ¶¶ 50–51.

Plaintiff disputes this characterization of the collision. She asserts that, once Estabrook reached the crowd of protesters, he immediately pushed one of the two men and then shoved her, causing her to fall to the ground. Pl.'s L. R. 56(a)2 St. ¶¶ 46–47; Pl.'s St. of Suppl. Facts ¶¶ 9–10. Plaintiff also points to Estabrook's body camera video footage, in which she claims she is "visible" to Estabrook before he struck her. Pl.'s L. R. 56(a)2 St. ¶ 54. Plaintiff represents that she has sustained injuries to her head and back and experienced pain and emotional distress as a result of Estabrook's actions. Pl.'s St. of Suppl. Facts ¶¶ 41–42. The parties do not dispute that Plaintiff was never detained or arrested. Pl.'s L. R. 56(a)2 St. ¶¶ 56–57.

In March of 2021, Plaintiff filed the present action against Defendants, alleging six claims: (1) excessive force in violation of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 against Estabrook; (2) common law assault and battery against Estabrook; (3) common law recklessness

against Estabrook; (4) common law negligence against Estabrook; (5) municipal liability pursuant to Conn. Gen. Stat. § 52-557n against the City arising from Estabrook's conduct; and (6) municipal liability pursuant to § 52-577n against the City arising from Hohn's violation of ministerial duties. Defendants have moved for summary judgment on all claims.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." With respect to materiality, a fact is "material" only if a dispute over it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). With respect to genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation and internal quotation marks omitted).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence

of a genuine issue of material fact." *Id.* at 323.  A movant, however, "need not prove a negative when it moves for summary judgment on an issue that the [non-movant] must prove at trial.  It need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 324).  The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor.  *Anderson*, 477 U.S. at 249.  If the non-movant fails "to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof," then the movant will be entitled to judgment as a matter of law.  *Celotex Corp.*, 477 U.S. at 323.

### III.    COUNT ONE UNDER 42 U.S.C. § 1983

Plaintiff's claim in Count One, that Estabrook used excessive force in violation of the Fourteenth Amendment, arises under 42 U.S.C. § 1983.  "Section 1983 provides a private right of action against any person who, acting under color of state law, causes another person to be subjected to the deprivation of rights under the Constitution or federal law." *Blyden v. Mancusi*, 186 F.3d 252, 264 (2d Cir. 1999) (citing 42 U.S.C. § 1983).

Defendants contend summary judgment is warranted with respect to this claim for two reasons: first, because there is no genuine dispute of fact that Estabrook did not use excessive force; and second, because, even if Estabrook did use excessive force, he would be entitled to qualified immunity.  The Court considers each argument in turn.

A. <u>Excessive Force Under the Fourteenth Amendment</u>

   *1. Legal Standard*

The right of an individual who has not been arrested to be free from excessive force arises under the Fourteenth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989); *Edrei v. Maguire*, 892 F.3d 525, 533 (2d Cir. 2018); *Abujayyab v. City of New York*, No. 15 Civ. 10080 (NRB), 2018 WL 3978122, at *4 (S.D.N.Y. Aug. 20, 2018). Although the right to be free from excessive force is commonly associated with the Fourth Amendment, which applies to arrestees, and the Eighth Amendment, which applies to individuals who have been convicted, *see Abujayyab*, 2018 WL 3978122, at *4, an individual who has not been arrested may proceed with a cause of action for excessive force under the Fourteenth Amendment's Due Process Clause because the "protection of the individual against arbitrary action of government" is the "touchstone of due process." *Edrei*, 892 F.3d at 533 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)).

To prevail on a claim of excessive force in violation of the Fourteenth Amendment, a plaintiff must show "that the force purposely or knowingly used against [her] was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015). In other words, a plaintiff must demonstrate both (1) the defendant's purposeful or knowing state of mind, and (2) the objective unreasonableness of his use of force. *See id.* This standard cannot be applied "mechanically"; rather, it "turns on the facts and circumstances of each particular case." *Id.* at 397 (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998), then quoting *Graham*, 490 U.S. at 396).

Regarding the first element, a defendant must have possessed "a purposeful, a knowing, or possibly a reckless state of mind" to be liable for excessive force. *Id.* at 396. Historically, the Fourteenth Amendment's guarantee of due process "has been applied to *deliberate* decisions of

government officials to deprive a person of life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 331 (1986) (emphasis in original).  As such, "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Lewis*, 523 U.S. at 849.  Thus, if the plaintiff's claim amounts to no more than negligently inflicted force, the claim cannot proceed. *See Kingsley*, 576 U.S. at 396.

The second element considers whether the force employed was objectively unreasonable. *Id.* at 397.  The force employed will be deemed objectively unreasonable if it was "not rationally related to a legitimate governmental objective," or if it was "excessive in relation to that purpose." *Edrei*, 892 F.3d at 535–36 (citing *Kingsley*, 576 U.S. at 398, and *Lewis*, 523 U.S. at 846).  "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 576 U.S. at 396.  "This objective showing can be established through contextual factors," *Edrei*, 892 F.3d at 534, such as: "the need for force, including the threat reasonably perceived by the officer and whether the plaintiff was actively resisting," *Abujayyab*, 2018 WL 3978122, at *6; "the relationship between the need for the use of force and the amount of force used," *Kingsley*, 576 U.S. at 397; "the extent of the plaintiff's injury," *id.*; and "any effort made by the officer to temper or to limit the amount of force," *id.*[2]

---

[2] This articulation of the Fourteenth Amendment's excessive force standard elaborates on, but does not altogether abandon, the traditional articulation of whether the use of force "shocks the conscience." *Edrei*, 892 F.3d at 536 ("To put a finer point on it, *Kingsley* teaches that purposeful, knowing or (perhaps) reckless action that uses an objectively unreasonable degree of force *is* conscience shocking." (emphasis in original))

*2. Discussion*

*a.*   Knowing or Reckless State of Mind

The Court first finds that there are genuine disputes of material fact as to whether Estabrook's use of force against Plaintiff was knowing, or at least reckless.[3]  Specifically, based on the evidence, there is a genuine dispute regarding whether Estabrook saw Plaintiff before he pushed through the two men standing in front of her and then pushed her.  Estabrook represents that he did not see Plaintiff before the two men standing in front of her fell because one of the men was six feet, four inches tall, blocking his view of Plaintiff.  *See* Defs.' L. R. 56(a)1 St. ¶ 48.  But Estabrook himself is six-feet, five-inches tall, *see* Estabrook Dep., ECF No. 25-3, at 31, so a reasonable jury could infer that he was able to see Plaintiff past the men in front of him and thus knowingly shoved Plaintiff.  Alternatively, it is undisputed that Estabrook's use of force to push aside the two men was purposeful and knowing, *see* Defs.' L. R. 56(a)1 St. ¶ 47, so a reasonable jury could find that his use of force against Plaintiff was the natural result of his purposeful use of force against the two men standing between him and Plaintiff, and was at least reckless.

The video evidence from the police officers' body cameras could further support a jury's reasonable conclusion that Estabrook acted at least knowingly or recklessly.  Based on the Court's review of that video footage, Plaintiff—distinctive because of her brightly colored green shirt— was indeed visible to Estabrook before he struck her.  A reasonable jury viewing that video footage could find that Estabrook saw her and acted knowingly by shoving her as he moved toward the officers he was attempting to assist.  Moreover, the video footage portrays Estabrook urgently and roughly pushing through the crowd, from which a reasonable jury could infer that he acted at least recklessly in pushing aside protesters, such as Plaintiff, without first assessing whether they posed

---

[3] For purposes of this discussion, since the Court finds that there are questions of material fact pertaining to whether Estabrook acted knowingly or recklessly, the Court need not reach the issue of whether he acted purposefully.

a threat.  In sum, there are genuine issues of fact as to whether Estabrook acted knowingly or recklessly, which would fall within the Fourteenth Amendment's prohibition on excessive force, or whether he acted negligently, which would not.

> *b.*   Objective Reasonableness of Force

In addition, the Court finds that there are genuine disputes of material fact as to whether Estabrook's use of force, if deliberate, was objectively unreasonable.  As noted above, the objective reasonableness of Estabrook's use of force turns on various factors, such as the need for force, the proportionality between the need for force and the amount of force used, the extent of Plaintiff's injury, and Estabrook's effort to temper the amount of force used.  *See Kingsley*, 576 U.S. at 397; *Edrei*, 892 F.3d at 534; *Abujayyab*, 2018 WL 3978122, at *6.

The relative weight of these factors was discussed in *Edrei*, which involved police conduct during a protest.  In *Edrei*, hundreds of people participated in a protest in Manhattan and blocked an intersection.  892 F.3d at 530.  Without warning, New York Police Department officers activated military-grade sound amplification technology at a volume sufficient to cause discomfort and hearing loss to the protesters.  *Id.* at 530.  In considering a motion to dismiss the complaint, the Second Circuit held that the allegations stated a plausible claim that the use of the sound technology was objectively unreasonable under all the factors set forth in *Kingsley* and prior Circuit cases.  Specifically, the court reasoned that: the need for force was limited due to the compliant and non-violent nature of the protest; the sound technology was disproportionately dangerous relative to the limited threat posed by the protest; the plaintiffs suffered actionable injuries; and the police officers made no attempt to warn or disperse the protesters before employing the sound technology.  *Id.* at 537–38.

The application of those factors to the present case presents a much closer question than *Edrei*, but it ultimately compels an analogous conclusion. While the court in *Edrei* identified several factual allegations that, if ultimately proven, would render the force employed by the police officers excessive, here many similar facts are genuinely disputed.

First, with respect to the need for force, it is plain that there was *some* need for the police officers, including Estabrook, to respond to the Code 30 with urgency, but the degree of force necessary under the circumstances is disputed. As the group of approximately fifty protesters continued past the protest's predesignated endpoint, the protesters refused to comply with the police officers' repeated requests that they move onto the sidewalk or onto a narrower section of the road to allow some vehicular traffic to pass. In the few minutes before Hohn called the Code 30, the video footage demonstrates that the conflict and tension between the police officers and protesters was escalating. It is undisputed that the officers repeatedly told protesters to "get back" and that they would be arrested if they did not get back on the sidewalk, but many of the protesters, including Plaintiff, did not comply. Pl.'s L. R. 56(a)2 St. ¶¶ 30, 32–33. In addition, the fact that Hohn and another officer present at the scene called a Code 30, the most urgent response code requiring an emergency response, demonstrates that there was some need for Estabrook and the other responding police officers to use force to reach the distressed officers. *Id.* ¶¶ 28, 34, 36. This starkly contrasts with the facts in *Edrei*, where that the security risk posed by the protesters was "minimal" and "the threat reasonably perceived by the officers was negligible" because the protesters "promptly complied" with the officers' requests to move to the sidewalks. 892 F.3d at 537–38. In other words, the protesters here presented a greater threat than in *Edrei*.

That said, a reasonable jury could find that the need for force in this case was relatively limited. Estabrook testified that there were no weapons at the protest, nor were there any reports

of shots fired or officers injured during the protest.  Pl.'s St. of Suppl. Facts ¶¶ 26–28.  This fact
mirrors the allegations in *Edrei* that the protesters were not violent.  892 F.3d at 537.  Moreover,
while the protesters in this case did not comply with the police officers' directions to get back and
disperse, there is no evidence that they actively resisted arrest or attempted to attack the police
officers.  *See id.*

The potentially limited nature of the need for force informs the next factor, whether the
force employed by Estabrook was disproportionate to the need for force.  Even accepting that the
protesters posed some degree of threat to the police officers who called the Code 30, a reasonable
jury viewing the video footage could conclude that the force with which Estabrook pushed through
the crowd and shoved Plaintiff was disproportionate to the need of the particular threat, under the
circumstances.  In seeking summary judgment, Defendants contend that the disparity between the
threat posed by the protesters in this case and Estabrook's conduct in simply pushing Plaintiff with
the force of his arms is not as stark as the disparity between the threat posed by the protesters in
*Edrei* and those police officers' employment of a military-grade weapon.  While the Court agrees
that *Edrei* is distinguishable on the facts relevant to proportionality, that does not necessarily
render Estabrook's use of force proportional.

For example, a reasonable jury viewing the video footage of the incident could observe
that other officers responding to the Code 30 pushed other protesters with much less force than
Estabrook and that those protesters did not fall to the ground like Plaintiff.  Thus, the jury could
infer that Estabrook could have made his way through the crowd to Hohn by employing less force
and that, as a result, the force he employed was disproportionate.  Another question of fact relevant
to the proportionality of the force employed against Plaintiff, specifically, is her status as a liaison
between the protesters and the police officers.  Plaintiff represents, and Defendants do not

meaningfully contest, that Hohn consulted Plaintiff so she could "assist" the police officers in monitoring the protest.  Pl.'s St. of Suppl. Facts ¶ 2.  In this role, she may have posed less risk to Hohn and the police officers than the other protesters at the scene, and the video footage appears to show that she may have been attempting to deescalate the conflict.  At least one police officer seemed to recognize this because, in the video footage, he can be heard referring to Plaintiff by name, observing that she had fallen, and asking another officer to help her stand up.  But what Estabrook knew about Plaintiff's unique role in the protest is a question of fact.  A reasonable jury considering those facts could conclude that the force employed against Plaintiff was disproportionate in light of her particular role throughout the protest.

In addition, a reasonable jury could find Estabrook's use of force disproportionate in light of the apparent absence of any attempts to temper his use of force, another relevant factor and similarity to *Edrei*.  Estabrook testified that, upon arriving at the scene, he did not announce his presence or tell any of the protesters standing between him and Hohn to move out of his path.  Estabrook Dep. at 31.  Estabrook further testified that the protesters were standing with their backs to him and could not have seen his approach.  *Id.* at 32.  Thus, like in *Edrei*, the lack of any "audible dispersal warning" or "visible attempt to move protesters" out of Estabrook's way creates a genuine dispute as to whether the force employed was objectively reasonable.  892 F.3d at 538.  Defendants argue that this case is distinguishable from *Edrei* because Hohn and the other police officers present called the Code 30 only after repeatedly instructing the protesters to "get back" and move onto the sidewalk.  Whether such warnings were enough to render *Estabrook's* unannounced use of force reasonable is, the Court concludes, a question of disputed fact fit for a jury.  At this stage, the Court is convinced that a reasonable jury could conclude that Hohn's

warnings may not have alerted Plaintiff that Estabrook would come barreling toward her from a different direction, without audibly announcing his presence.

Finally, the injuries suffered by Plaintiff fit within the spectrum of injuries the Second Circuit has found sufficient to support a claim of excessive force in violation of the Fourteenth Amendment.  Plaintiff reported that, because she was knocked to the ground and another protester also pushed by Estabrook fell on her head, she suffered injuries to her head and back, causing her "severe pain and emotional distress" and requiring magnetic resonance imaging (MRI) and x-ray imaging.  ECF No. 21-6 at 4.  Such injuries could support a reasonable jury's finding that the force employed was excessive.  *See Edrei*, 892 F.3d at 538 (finding "auditory pain, migraines, tinnitus, and hearing loss" within the ambit of injuries sufficient to state a Fourteenth Amendment claim for excessive force); *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 252 (2d Cir. 2001) (finding "head trauma, lacerations, and bruising," as well as "emotional injuries," to be "conscience-shocking" in violation of the Fourteenth Amendment).  Defendants do not directly dispute that Plaintiff suffered these injuries; they merely contend that the injuries were not severe because Plaintiff stood up soon after Estabrook pushed her and refused police officers' offer for medical assistance.  In light of the undisputed fact that she suffered some sort of injury, however, the disputed facts regarding the severity of that injury are best left to a jury.

In sum, when the evidence is considered in the light most favorable to Plaintiff, there are genuine disputes of fact concerning the need for force; the effect of Hohn's warnings on the reasonableness of Estabrook's force; whether the force employed by Estabrook was disproportionate under the circumstances; whether Estabrook made any efforts to limit the degree of force employed; and the severity of the injuries suffered by Plaintiff.  These genuine disputes lead the Court to conclude that a reasonable jury could find the force employed by Estabrook

objectively unreasonable.  For that reason, and because there are genuine disputes of fact as to whether Estabrook employed the force in question knowingly or recklessly, the Court denies Defendants' motion for summary judgment on the issue of whether Estabrook employed excessive force in violation of the Fourteenth Amendment.

### B.  Qualified Immunity

#### 1.  *Legal Standard*

Defendants next contend that, even if Estabrook used excessive force in violation of the Fourteenth Amendment, he is entitled to summary judgment on Plaintiff's § 1983 claim because he is protected by qualified immunity.  The doctrine of qualified immunity shields governmental officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability while they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The United States Supreme Court has established a two-pronged test governing the qualified immunity defense.  "First, a court must decide whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right."  *Id.* at 232.  As explained above, there are genuine issues of material fact as to whether Estabrook used excessive force in violation of the Fourteenth Amendment, which satisfies the first prong of the test for the purpose of the present motion for summary judgment.  *See Cugini v. City of New York*, 941. F.3d 604, 615 (2d Cir. 2019) (holding that a plaintiff who had raised sufficient disputes of fact on an excessive force claim to survive a motion for summary judgment had "established a Fourth Amendment

violation for present purposes," and then proceeding to analyze the second prong of the qualified immunity analysis).

Under the second prong, "the court must decide whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Id.* A police officer's conduct "violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (alterations omitted)). "An official is therefore entitled to immunity if his action was 'objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken.'" *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (quoting *X–Men Sec., Inc. v. Pataki,* 196 F.3d 56, 66 (2d Cir. 1999)).

In other words, this prong of the qualified immunity analysis turns on two related questions: first, whether the precise contours of the right at issue were clearly established; and second, whether it was objectively reasonable for the defendant to believe that his actions complied with that clearly established law. *See Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) ("Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." (citation and internal quotation marks omitted)); *LaFever v. Clarke*, 525 F. Supp. 3d 305, 319 (N.D.N.Y. 2021) ("To help sharpen the analysis, courts often break the second prong down into a pair of separate considerations: (a) whether the defendant's action violated clearly established law and, even if it did, (b) whether it was objectively reasonable for the defendant to believe that his action was nevertheless lawful at the time.").

Relevant to the first question, law is "clearly established" when, at the time of the officer's conduct, the "legal principle [was] sufficiently clear in then-existing precedent." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). *See also Edrei*, 892 F.3d at 539 ("And, because officers cannot have fair warning of rights that are not yet established, we look to precedent in existence at the time of the events."). In other words, the rule "must be settled law," meaning "it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'" *Wesby*, 138 S. Ct. at 589–90 (quoting *al-Kidd*, 563 U.S. at 741–42). "The matter of whether a right was clearly established at the pertinent time is a question of law." *Kerman v. City of New York*, 374 F.3d 93, 108 (2d Cir. 2004). There need not be "a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." *al-Kidd*, 536 U.S. at 741. "This 'clearly established' standard also requires the settled law to be 'particularized' to the facts of the case," *LaFever*, 525 F. Supp. 3d at 319 (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)), which "requires a high degree of specificity," *Wesby*, 138 S. Ct. at 590 (citation and internal quotation marks omitted). By requiring the law to be clearly established to a particularized degree, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *al-Kidd*, 563 U.S. at 743 (citation and internal quotation marks omitted).

Relevant to the second question, "even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169–70 (2d Cir. 2007) (quoting *Creighton*, 483 U.S. at 641). Thus, qualified immunity gives police officers "breathing room to make reasonable but mistaken judgments about open legal questions." *al-Kidd*, 563 U.S.

at 743.  The question of whether an officer's conduct was objectively reasonable "is a mixed question of law and fact."  *Kerman*, 374 F.3d at 109.

### 2. *Discussion*

Here, Estabrook is entitled to qualified immunity and, accordingly, judgment as a matter of law with respect to Plaintiff's § 1983 claim.  Even accepting the genuine disputes of fact relevant to the question of whether Estabrook employed excessive force in violation of the Fourteenth Amendment, his conduct did not violate clearly established law, nor was it objectively unreasonable for him to believe that his conduct was lawful.

The Court must "begin with the delicate task of defining the right at issue."  *Edrei*, 892 F.3d at 539.  As noted above, the U.S. Supreme Court has instructed federal courts to define the particular right at issue, and to compare the facts of the present case with the facts of the cases clearly establishing the relevant law, with specificity.  *See Wesby*, 138 S. Ct. at 590.  At the same time, federal courts should not characterize the right "too narrowly to the facts of the case," which would convert the qualified immunity inquiry into "a presumption against the existence of basic constitutional rights."  *Edrei*, 892 F.3d at 539–40 (quoting *Johnson*, 239 F.3d at 251).  In the context of a Fourteenth Amendment excessive force claim, "[d]efining the Fourteenth Amendment right according to the particular circumstances requires attention to the precipitating events, the government interest at issue, the degree of force used, and the reasonably anticipated consequences of the government action."  *Id.* at 539 (internal quotation marks omitted).  Following the example set forth in *Edrei*,[4] the question here is whether, in 2020, Plaintiff, a nonviolent but noncompliant

---

[4] In *Edrei*, the court defined the right as: "whether, in 2014, non-violent protesters and onlookers, who officers had not ordered to disperse, had a right not to be subjected to pain and serious injury that was inflicted to move them onto the sidewalks."  892 F.3d at 539.  *But see Pourkavoos v. Town of Avon*, 823 F. App'x 53, 61 (2d Cir. 2020) (summary order) (interpreting *Edrei* as holding that it was "clearly established 'that using force in a crowd control context violates due process'").

protester, had a right not to be pushed to the ground by a police officer responding to an emergency situation without a preceding warning from the officer to move out of the way.

Considering the state of the law in the Second Circuit regarding emergency police response during a protest, such a right was not clearly established at the time of Plaintiff's injuries. Plaintiff points to only one controlling case, *Edrei*, that involved specific circumstances similar to the present case. As explained above, the factual differences between *Edrei* and this case do not render it inapposite when considering whether Estabrook's actions constituted excessive force. Those differences, however, take on greater importance when considering the distinct question of whether *Edrei*, with its particular facts, clearly established that Estabrook's actions constituted excessive force under the particular circumstances of the present case. Crucially, the complaint in *Edrei* contained no allegations of any threat to public safety or the police officers themselves, as the protest was not violent and the protesters complied with the officers' directions. 892 F.3d at 537–38. While the Second Circuit acknowledged case law establishing that police officers "may stop or disperse a protest when faced with an 'immediate threat to public safety, peace, or order,'" *id.* at 541 (quoting *Jones v. Parmley*, 465 F.3d 46, 57 (2d Cir. 2006)), the court found that case law insufficient to support the reasonableness of the police officers' actions because the protesters in *Edrei* posed no such immediate threat. Here, by contrast, it is undisputed that Hohn issued a Code 30, the most urgent police call requiring an emergency response. In light of this crucial distinguishing fact, *Edrei* could not have clearly established Plaintiff's right to be free from the unannounced force employed by Estabrook to reach Hohn and the other police officers in distress.

To be sure, a protester's freedom from the use of excessive force is, at a high level of generality, a clearly established constitutional right. *See Edrei*, 892 F.3d at 540–41; *Abujayyab*, 2018 WL 3978122, at *8; *Harrell v. Cty. of Nassau*, No. 10-CV-5894 (MKB), 2013 WL 5439137,

at *12 (E.D.N.Y. Sept. 27, 2013).  And a reasonable jury could conclude that Plaintiff's general right to be free from excessive force was violated under the present circumstances, as explained above.  But the U.S. Supreme Court has explained that defining a right at such a high level of generality does not render the right clearly established for the purpose of evaluating a qualified immunity defense.  *al-Kidd*, 563 U.S. at 742 ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality.").  This is because the general proposition that excessive force violates the Fourteenth Amendment "is of little help in determining whether the violative nature *of particular conduct* is clearly established," such that every reasonable officer would have known that the particular conduct violated that right.  *See id.* (emphasis added).  Here, although Plaintiff's general right to be free from excessive force may have been violated, the particular contours of that right in the precise scenario at issue were not clearly defined; accordingly, not every reasonable officer would have understood that Estabrook's actions violated that particularized right under these particular circumstances.  *See id.* at 741.

For similar reasons, even if it was clearly established that Estabrook's actions violated Plaintiff's particularized right, it was objectively reasonable for Estabrook to believe that his actions did not violate such right.  Although a police officer responding to the Code 30 may not have known what particular imminent harm the calling officers faced, the exigent nature of that code would have led a reasonable officer to believe that an urgent response was needed.  As discussed above, a jury might conclude that Estabrook employed more force than proportionately necessary, but the force employed was not as dramatically disproportionate as in *Edrei* to render Estabrook's belief in the reasonableness of that use of force unreasonable.  Moreover, a police officer in Estabrook's position could have reasonably believed that he did not need to reiterate Hohn's warnings to the protesters before pushing them aside, in light of the urgent nature of the

code and the protesters' general noncompliance with the police officers' directions throughout the protest. Finally, while it appears that Hohn asked Plaintiff to assist him in deescalating the conflict, the record presently before the Court contains no evidence that the patrol officers monitoring the protest, such as Estabrook, had a reason to believe Plaintiff should be treated differently from any other noncompliant protester.

In sum, qualified immunity is appropriate for circumstances, like the present case, when police officers may "make reasonable but mistaken judgments about open legal questions." *al-Kidd*, 563 U.S. at 743. Plaintiff has not identified any "controlling authority" or "robust consensus of cases of persuasive authority" that is "clear enough that every reasonable official would interpret it to establish" the unconstitutionality of Estabrook's conduct. *Wesby*, 138 S. Ct. at 589–90 (citations and internal quotation marks omitted). In other words, although a reasonable jury could conclude that Estabrook employed excessive force under the circumstances of the present case, existing precedent does not put the question beyond debate among officers of reasonable competence. *See LaFever*, 525 F. Supp. 3d at 319 ("Put differently, if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context, the officer is still entitled to qualified immunity." (citation and internal quotation marks omitted)). In a close case such as this one, qualified immunity is proper, and Defendants' motion for summary judgment with respect to Plaintiff's § 1983 claim, Count One, is granted on that ground.

## IV.    COUNTS TWO, THREE, AND FIVE UNDER STATE LAW

Defendants also seek summary judgment on Plaintiff's remaining state law claims: common law assault and battery, Count Two; common law recklessness, Count Three; and municipal liability pursuant to Conn. Gen. Stat. § 52-557n(a)(1), Count Five.[5] With respect to the

---

[5] At oral argument, Plaintiff abandoned her claim of common law negligence (Count Four) and her claim for municipal liability arising from Hohn's ministerial acts (Count Six).

claims against Estabrook, Counts Two and Three, Estabrook contends that he is entitled to common law immunity for municipal employees.  With respect to the claim against the City, Count Five, the City contends that it is entitled to statutory immunity pursuant to Conn. Gen. Stat. § 52-557n(a)(2).  Defendants also argue that there is no genuine dispute of material fact that Estabrook did not commit assault or battery or act recklessly.

Before addressing the state law claims, the Court notes that Defendants have argued that, if the Court dismisses the § 1983 claim (as it now has), it should decline to exercise supplemental jurisdiction over the remaining state law claims because the claim over which this federal court had original jurisdiction is no longer live, and because, they contend, the scope of the state law governmental immunities appears to present novel questions of state law that are better resolved by the state courts.  *See* 28 U.S.C. § 1367(c)(1) & (c)(3).  Although the federal claim has not survived, the Court is unconvinced that the state law claims present truly novel issues of state law such that the Court should defer to the state court in the interest of comity.  Indeed, Defendants' summary judgment briefing did not originally request that the Court decline to exercise supplemental jurisdiction over the state law claims.  In addition, given the advanced stage of this case and this Court's familiarity with the issues presented, the additional interests of judicial economy, convenience, and fairness weigh in favor of the Court resolving the remaining state law claims.  *See Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2014) (explaining that "a district court should not decline to exercise supplemental jurisdiction unless it also determines that doing so would not promote the values" of economy, convenience, fairness, and comity); *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 86 (2d Cir. 2018) (expressing skepticism about how judicial economy, convenience, fairness, or comity would be served by "requiring the parties

to expend additional years as well as dollars re-litigating in state court").  For these reasons, the Court will address the viability of Plaintiff's remaining state law claims.

      A.  <u>State Law Governmental Immunities</u>

Connecticut common law and § 52-557n provide, under certain circumstances, governmental immunity for municipal employees and municipalities, respectively.  *Daley v. Kashmanian*, 344 Conn. 464, 479 (2022).  Section 52-557n generally extends "the same discretionary act immunity that applies to municipal officials to the municipalities themselves," rendering the two immunities subject to the same standard, *id.* at 480 (citation and internal quotation marks omitted), except as discussed below.  The question of a municipality's or municipal employee's governmental immunity under Connecticut law is, however, distinct from the federal qualified immunity inquiry and "requires separate consideration."  *Fleming v. City of Bridgeport*, 284 Conn. 502, 531–32 (2007).

These immunities shield municipal employees and municipalities from liability arising from the employee's "misperformance" of "discretionary" acts, which are defined by the exercise of judgment.  *Daley*, 344 Conn. at 479 (quoting *Cole v. City of New Haven*, 337 Conn. 326, 336 (2020)); *see also* Conn. Gen. Stat. § 52-557n(a)(2)(B) (providing that a municipality shall not be liable for damages caused by actions "which require the exercise of judgment or discretion").  The immunities attach to discretionary acts "because of the danger that a more expansive exposure to liability would cramp the exercise of official discretion beyond the limits desirable in our society." *Cole*, 337 Conn. at 337 (citation and internal quotation marks omitted).  By contrast, the immunities do not protect employees and municipalities from liability arising from the employee's "ministerial" acts.  *Daley*, 344 Conn. at 479 (quoting *Cole*, 337 Conn. at 336).  A ministerial act "is one which a person performs in a given state of facts, in a prescribed manner, in obedience to

the mandate of legal authority, without regard to or the exercise of his own judgment or discretion." *Cole*, 337 Conn. at 338 (alteration, citation, and internal quotation marks omitted).  Thus, the first question is whether the municipal employee's conduct was discretionary or ministerial in nature.

Here, there is no genuine dispute that Estabrook's conduct was discretionary in nature, which triggers his common law immunity and the City's statutory immunity.  The Connecticut Supreme Court has repeatedly held that the operation of a police department is a discretionary governmental function, and "acts or omissions in connection therewith ordinarily" fall within the discretionary statutory immunity.  *Daley*, 344 Conn. at 481 (quoting *Cole*, 337 Conn. at 338–39).  Similarly, police officers are generally protected by the discretionary act common law immunity "when they perform the typical functions of a police officer."  *Id.* at 78–79 (quoting *Cole*, 337 Conn. at 339).  There may be circumstances when a police officer's misconduct is ministerial in nature, rather than discretionary, and therefore falls outside the scope of the immunities.  *See id.* at 500–01 (holding that, although a police officer's decision to surveil the plaintiff by car was discretionary, the officer's operation of a car on public streets was ministerial because the officer was "legally bound to comply with the statutory rules of the road").  Here, however, Plaintiff has not identified any "statute, city charter provision, ordinance, regulation, rule, policy, or other directive that, by its clear language, compels a [police officer] to act in a prescribed manner, without the exercise of judgment or discretion," relevant to Estabrook's actions in the present case.  *See Cole*, 337 Conn. at 338 (citation and internal quotation marks omitted).

Accordingly, the common law immunity shields Estabrook from liability, and the statutory immunity shields the City from liability, with respect to Plaintiff's state law claims, unless there is an applicable exception.

B.  Exceptions to the State Law Governmental Immunities

Connecticut law recognizes three general exceptions to the state law governmental immunities.  *See Fleming*, 284 Conn. at 531–32.  First, the immunities do not apply when "the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm."  *Id.* (citations and internal quotation marks omitted).  Second, the immunities do not apply when "a statute specifically provides for a cause of action against a municipality or municipal official for failure to enforce certain laws."  *Id.* (citations and internal quotation marks omitted).  Third, the immunities do not apply when "the alleged acts involve malice, wantonness or intent to injure, rather than negligence."  *Id.* (citations and internal quotation marks omitted).

Plaintiff relies only on the third of the exceptions set forth above, contending that there are genuine disputes of material fact as to whether Estabrook acted with malice, so the governmental immunities should not apply.  Because this exception applies somewhat differently to the common law immunity and the statutory immunity, the Court considers it with respect to each immunity separately.

*1.  Common Law Immunity for Municipal Employees*

With respect to Estabrook's entitlement to common law governmental immunity, under the circumstances of the present case, no reasonable jury could find that Estabrook acted with "malice" or "wantonness," as required to divest him of the common law governmental immunity for discretionary acts.  *See Fleming*, 284 Conn. at 532.  "A showing that officers acted with malice such that they are not entitled to [common law governmental] immunity is a heavy burden."  *Id.* at 535.  Plaintiff has not met this burden.

In concluding above that there were genuine disputes of fact with respect to Estabrook's state of mind, relevant to Plaintiff's excessive force claim, the Court pointed to evidence that could support a conclusion by a reasonable jury that Estabrook acted *knowingly* or *recklessly*.  For example, the documentary and video evidence raised genuine disputes of fact as to whether Estabrook saw Plaintiff standing behind the two men before he pushed them and, thus, whether he knowingly, or at least recklessly, pushed Plaintiff.  While demonstrating more than mere negligence, that evidence does not suggest that Estabrook acted with wanton intent to injure, as required to fall within the relevant exception to the common law governmental immunity.  Rather, it is undisputed that Estabrook's "objective" was "to get to the officers in need and make sure they were okay."  Pl.'s L. R. 56(a)2 St. ¶ 42.  Even if a reasonable jury were to find that Estabrook knowingly or recklessly caused Plaintiff's injury in the course of pursuing that objective, such a finding would not be enough, standing alone, to support a conclusion that he wantonly or maliciously intended to cause Plaintiff's injury, particularly in light of his undisputed objective to reach Hohn urgently.

In addition, the Connecticut Supreme Court has explained that, when a police officer's conduct is "objectively reasonable," it generally does not rise to "the level of inappropriateness necessary to create an inference of malice," even if the conduct was not "ideal under the circumstances."  *Fleming*, 284 Conn. at 536.  Similarly, as explained above with respect to Plaintiff's § 1983 claim, Estabrook's conduct in the present case was perhaps mistaken under constitutional law, but objectively reasonable in light of the perceived exigency relating to the Code 30.  Thus, the Court finds no genuine dispute of fact on the question of whether Estabrook acted with malice or wantonness, and that exception could not divest Estabrook of his common law discretionary act immunity.

Plaintiff urges the Court to infer malicious intent from the absence of probable cause to arrest her,[6] but the Connecticut Supreme Court has rejected that very argument. *Id.* ("Additionally, the plaintiff has not provided any authority, nor has our research revealed any, for the proposition that we can infer malice [for the purpose of the common law discretionary act immunity] solely because of a lack of probable cause."). Moreover, the one case on which Plaintiff relies involved a police officer's qualified immunity from liability for an arrest without probable cause and a subsequent malicious prosecution, *see Stonick v. DelVecchio*, 438 F. Supp. 3d 154, 163–69 (D. Conn. 2020), facts which are readily distinguishable from the present case. Because no reasonable jury could find that Estabrook acted with "malice" or "wantonness," the malice exception does not apply, and thus Estabrook is protected by the common law immunity for a municipal employee's discretionary acts.

### 2. *Statutory Immunity for Municipalities*

Plaintiff argues that the City is not protected by the statutory immunity for the same reason she contends that Estabrook is not protected by the common law immunity—specifically, because there are genuine disputes of fact as to whether Estabrook acted with malice. To the extent the malice exception indeed applies to the statutory immunity, Plaintiff's argument fails with respect to the City for the same reason it fails with respect to Estabrook. As explained above, no reasonable jury could find that Estabrook acted with malice.

In addition, even if a reasonable jury could find that Estabrook acted with malice, the City would nevertheless be entitled to judgment as a matter of law. As noted above, § 52-557n generally extends "the same discretionary act immunity that applies to municipal officials to the

---

[6] The Court briefly notes that, as an initial matter, a police officer's decision not to arrest an individual does not by itself demonstrate that he lacked probable cause to do so. Moreover, Plaintiff does not so much as mention the probable cause standard governing a police officer's warrantless arrest.

municipalities themselves." *Daley*, 344 Conn. at 480.  After reviewing the plain text of the statute, however, the Court cannot accept Plaintiff's contention that the malice exception, applicable to the common law immunity for municipal employees, applies in a similar fashion to the statutory immunity for municipalities.  Section 52-557n(a)(2) provides, in full: "Except as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property caused by: (A) Acts or omissions of any employee, officer or agent which constitute criminal conduct, fraud, actual malice or wilful misconduct; or (B) negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." Conn. Gen. Stat. § 52-557n(a)(2) .

In other words, the statutory immunity shields municipalities from liability arising from an employee's criminal, fraudulent, malicious, or willful misconduct and negligently performed discretionary misconduct.  The scope of the statutory immunity provided by subsection (B) mirrors the scope of the common law discretionary act immunity, as discussed above.  Subsection (A) of the statutory immunity, however, specifically *immunizes* municipalities from liability arising from the malicious misconduct of their employees.  By contrast, the malice exception under Connecticut common law *divests* municipal employees of their immunity under such circumstances.  Thus, reading the common law malice exception into the statutory immunity appears to directly contradict the scope of the immunity provided by the plain language of § 52-557n(a)(2)(A).

Plaintiff presumes that the malice exception applies to the statutory immunity, but she has not explained how the Court can read the common law malice exception into the statutory immunity without conflicting with the scope of the immunity provided by § 52-557n(a)(2)(A).  For example, Plaintiff has not explained how Estabrook could, on the one hand, be found to have acted with "malice, wantonness or intent to injure," *Fleming*, 284 Conn. at 531–32, such that his conduct

falls within the malice exception to his own immunity, but also, on the other hand, be found *not* to have acted with "actual malice or wilful misconduct," such that his conduct falls outside the scope of the statutory immunity provided to the City by § 52-557n(a)(2)(A).  To the extent those terms indeed hold different meanings and impose different standards under Connecticut law, Plaintiff has not raised such an argument, nor has Plaintiff explained how the facts of this case fit into the narrow gap between those standards.  Moreover, Plaintiff has not identified another case in which a municipality has been liable for the malicious misconduct of its employee notwithstanding § 52-557n(a)(2)(A).  In light of those deficiencies and the plain language of the statute, the Court concludes that, even if Estabrook acted with malice or intent to injure as contemplated by the common law malice exception, the City would be entitled to statutory governmental immunity according to the plain text of § 52-557n(a)(2)(A).  Thus, the City is entitled to judgment as a matter of law with respect to the state law claim against it, Count Five.

In sum, the Court concludes that (1) Estabrook is entitled to the common law discretionary act immunity with respect to Counts Two and Three, and (2) the City is entitled to the statutory governmental immunity with respect to Count Five.  Thus, the Court grants Defendants' motion for summary judgment with respect to those claims.

## V.    CONCLUSION

For the reasons described above, Defendants' motion for summary judgment, ECF No. 21, is GRANTED.  Specifically, although Plaintiff has shown genuine issues of material fact with respect to whether Estabrook employed excessive force in violation of the Fourteenth Amendment, he is entitled to qualified immunity under federal law.  In addition, the City is entitled to the governmental immunity provided by Conn. Gen. Stat. § 52-557n(a)(2), and Estabrook is entitled to Connecticut common law governmental immunity.  Thus, Defendants are entitled to judgment

as a matter of law on all remaining counts of the complaint.  The Clerk is directed to enter judgment in favor of Defendants and close this case.

**SO ORDERED** at Hartford, Connecticut, this 26th day of January, 2023.

         */s/ Sarala V. Nagala*
         SARALA V. NAGALA
         UNITED STATES DISTRICT JUDGE